**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 12-20071-CR-SEITZ**

**UNITED STATES OF AMERICA**

**v.**

**FRANCISCO CUBERO,**

**Defendant.**

_____/

**UNITED STATES'S RESPONSE IN OPPOSITION TO DEFENDANT'S
OBJECTIONS TO THE PSI AND REQUEST FOR A VARIANCE FROM
THE SENTENCING GUIDELINES**

Pursuant to Title 18, United States Code, Section 3553(a), the United States of America, by and through the undersigned Assistant United States Attorney, hereby files this Sentencing Memorandum, in opposition to Defendant's Objections to the PSI and Request for a Downward Variance from the sentencing guideline range (see Docket Entry ("D.E.") 36 and Defendant's Sentencing Memorandum (filed under seal)), and states the following in support thereof:

**INTRODUCTION**

The Defendant objects to the Presentence Investigation Report ("PSI") on several grounds. First, he objects to a two-level increase for "distribution" under Section 2G2.2(b)(3)(F) of the Sentencing Guidelines Manual (hereinafter, the "Sentencing Guidelines"), arguing that (a) he did not know he was disseminating child pornography by using peer-to-peer file sharing networks and (b) this enhancement is tantamount to double-counting. Second, he requests a two-level decrease under Section 2G2.2(b)(1) of the Sentencing Guidelines, arguing that because he did not intend to distribute child pornography, this reduction applies. As explained further

below, the Defendant is misguided.  The Eleventh Circuit has held that "[b]y doing nothing to protect the [downloaded child pornography] images and allowing them to remain in a shared folder, [a defendant] distributed the images within the meaning of Section 2G2.2(b)(3)(F)."  See, e.g., United States v. Nelson, 2011 WL 4584788, 442 Fed. Appx. 496, 498 (11th Cir. Oct. 5, 2011).  Therefore, the PSI has properly calculated the Defendant's total offense level (as a level 34).

In addition, the Defendant requests a downward variance from the sentencing guideline range.  The sentencing guideline range that the Defendant faces for pleading guilty to possession and distribution of child pornography is 151 to 188 months imprisonment.  The United States objects to the Defendant's request for a variance and argues that a sentence at the low-end of the sentencing guideline range, given the factors outlined in Section 3553(a), would be fair and just if imposed.  A downward variance, on the other hand, is inappropriate because of the graphic nature and content of the child pornography material possessed, the characteristics of the defendant, the grave need for general and specific deterrence in this case, and the impact that the sentencing will have on the public and victims of child pornography.

## **FACTUAL BACKGROUND**

- **Investigation**

On December 16, 2011, law enforcement, using investigative software, identified a user on a P2P file-sharing network who had been recently making files containing SHA-1 values associated with suspected images of child pornography available for distribution on the network. Law enforcement was able to identify the IP Address associated with that user as 77.74.155.54 (hereinafter the "IP Address").

On December 17, 2011, law enforcement officers, utilizing P2P software on an undercover computer, successfully established an Internet connection with a computer assigned to the IP Address.  Once establishing that connection, law enforcement downloaded eighteen (18) images files that had been made available for sharing from that computer.

Thereafter, law enforcement reviewed the contents and titles of the eighteen (18) image files downloaded on December 17, 2011, from the user utilizing the IP Address. The file titles for the eighteen (18) image files suggested that the files contained child pornography and some of the titles included phrases like "childlover", "pthc" (preteen hardcore), "pedo", and "childporn". Law enforcement reviewed the contents of the eighteen (18) image files and observed suspected child pornography in seventeen (17) of the image files as detailed below:

- File titled **pictures from ranchi torpedo dloaded in 2009- pedo kdv kidzilla pthc toddlers 0yo 1yo 2yo 3yo 4yo 5yo 6yo 9yo tara babyj (58).jpg,** which contains an image depicting a naked preteen female laying on a bed with her legs spread exposing her genitals.

- File titled **Aaaa Preteen Boys Clubomega Kids Boy Little Illegal Pedo Young Gay Teen Innocent Child 31.jpg,** which contains an image file depicting three (3) naked preteen / teenage boys laying on their stomachs in a pile of dirt and exposing their buttocks.

- File titled **pictures from ranchi torpedo dloaded in 2009- pedo kdv kidzilla pthc toddlers 0yo 1yo 2yo 3yo 4yo 5yo 6yo 9yo tara babyj (48).jpg,** which contains an image file depicting a preteen female performing oral sex on an adult male.

- File titled **la2-023-063 - 12yr old underage child daughter childsex childlover ptsc pthc lsm lsn pedo cum ass pussy hussyfan mafiasex r@ygold sandra lolita preteen model bd ls land.jpg,** which contains an image file depicting a naked minor female sitting with her legs crossed exposing her genitals.

- File titled **aaaa boylove gay pedo preteen boy sex child porn 218 (2).jpg,** which contains an image file depicting a preteen male engaging in anal sex with an adult male.

- File titled **(pthc pedo preteen) HQ XXX Porn Pics - 107.jpg,** which contains an image file depicting a naked minor female in a river with her legs open and her genitals exposed.

- File titled **PTHC Pedo NEW Childporn Private Daughter Torpedo Ranchi Lolita - Veronica_1173907670997.jpg,** which contains an image file depicting two naked preteen females sitting on a couch. Both preteen females have their legs spread and are exposing their genitals.

- File titled **PTHC Pedo NEW Childporn Private Daughter Torpedo Ranchi Lolita - Veronica_0006.jpg,** which contains an image file depicting two naked preteen females sitting on a couch. One of the females has her legs spread and is exposing her genitals.

- File titled **pictures from ranchi torpedo dloaded in 2009- pedo kdv kidzilla pthc toddlers 0yo 1yo 2yo 3yo 4yo 5yo 6yo 9yo tara babyj (233).jpg,** which contains an image file depicting a naked preteen female laying on a bed with her legs spread and exposing her genitals.

- File titled **PTHC Pedo NEW Childporn Private Daughter Torpedo Ranchi Lolita - 1262416126082.jpg,** which contains an image file depicting a naked preteen / minor female lying on a bed and exposing her genitals.

- File titled **PTHC Pedo NEW Childporn Private Daughter Torpedo Ranchi Lolita - 128578484341.jpg,** which contains an image file depicting a naked preteen female who is sitting on the floor with her legs spread exposing her genitals. An adult female is also lying on the floor and appears to be performing on oral sex on the preteen female.

- File titled **aaaa boylove gay pedo preteen boy sex child porn 228.jpg,** which contains an image file depicting an naked preteen/ minor male on a bed exposing his genitals and anus.

- File titled **9yo Jenny nude with legs spread wide apart showing pussy - underage lolita r@ygold pthc ptsc ddogprn pedo young child sex preteen hussyfan kiddie kiddy porn(1).jpg,** which contains an image file depicting a naked preteen female who is tied to a bed exposing her genitals.

- File titled **Imgsrc Ru Pthc Pedo Babyshivid Childlover Private Daughter Torpedo Ranchi Lolita - Family Moments (68).jpg,** which contains an image file depicting two naked preteen females, two naked adult females, and one naked preteen male. The two adult females are touching the naked preteen male's penis while the two naked preteen females watch.

- File titled **pictures from ranchi torpedo dloaded in 2009- pedo kdv kidzilla pthc toddlers 0yo 1yo 2yo 3yo 4yo 5yo 6yo 9yo tara babyj (156).jpg,** which

contains an image file depicting an adult female sitting in a chair and exposing her one of her breasts. A preteen female is standing next to the chair and has her mouth on the exposed breast of the adult female. The adult female also appears to have a toddler sitting in her lap.

· File titled **pictures from ranchi torpedo dloaded in 2009- pedo kdv kidzilla pthc toddlers 0yo 1yo 2yo 3yo 4yo 5yo 6yo 9yo tara babyj (51).jpg,** which contains an image file depicting a naked preteen female standing in a bathtub.

· File titled **PTHC Pedo NEW Childporn Private Daughter Torpedo Ranchi Lolita - Melinda_719.jpg,** which contains an image file depicting a naked adult male sitting with a naked toddler. The toddler is touching the adult male's erect penis while the adult male is touching / covering the toddler's genitals with his hand.

Law enforcement determined that the IP Address was assigned to Comcast Internet Services.   On January 9, 2011, law enforcement received subpoenaed business records from Comcast Internet Services which showed that on December 17, 2011, the IP Address, 75.74.155.54, was assigned to Defendant Francisco CUBERO (hereinafter, "CUBERO"), at 255 N.W. 45th Avenue, Miami, Florida 33126.  A Florida Department of Motor Vehicles inquiry for CUBERO revealed his address to be the same location, 255 N.W. 45th Avenue, Miami, Florida 33126 (the "Residence")**.**

- **Surveillance Conducted of the Residence**

On January 9, 2011, law enforcement conducted surveillance of the Residence.   A wireless Internet network scan of a portion of the property surrounding the Residence revealed only <u>one</u> (1) secured wireless network.  An additional wireless Internet network scan conducted from the driveway of the Residence revealed no wireless networks.  Law enforcement observed that the Residence is a two family residence duplex.

A Miami-Dade Property Tax inquiry revealed that the Residence is listed as a two family residence duplex owned by Vicente Cubero, the defendant's uncle and relative.

In early January 2012, law enforcement conducted surveillance of the Residence and observed a black G.M.C. parked at the residence. Investigation revealed the Black G.M.C. is registered to an employer of CUBERO. On January 17, 2012, federal law enforcement, assisted by the City of Miami Police Department conducted a 911 emergency phone call ruse at the Residence. City of Miami Police Department Officers who responded to the ruse stated they encountered CUBERO alone at the Residence, and that CUBERO confirmed that the Black G.M.C. belonged to him.

- **Search Warrant Executed at the Residence**

On January 19, 2012, law enforcement executed an authorized federal search at the Residence, and seized multiple electronic media from the Residence, including a HP Laptop computer and multiple CD-ROMs. A preliminary forensic examination of the HP Laptop computer revealed peer to peer software and files of suspected child pornography in the Saved folder of the Frostwire peer to peer program. The preliminary forensic examination also revealed thirteen (13) of the aforementioned seventeen (17) image files of suspected child pornography which had been downloaded by law enforcement on December 17, 2011, from the user of IP address 75.74.155.54. These thirteen (13) image files were located in the Frostwire Saved folder, in addition to multiple files of suspected child pornography, including the following:

> ▪ File titled **Raamat 1yo Pedo qqaazz 3Yo Se1 (Ptsc).jpg**, which contained an image of an infant holding an adult male penis;
>
> ▪ File titled **Qqaazz Pthc Pedo Dad Puts 5 Inches Into Toddler Boy Ass 02 (1).jpg**, which contains an adult male penis touching the anus of a naked male infant; and
>
> ▪ File titled **qqaazz pthc pedo dad puts 5 inches into toddler boy ass 08(1).jpg**, which contains an image of an adult male penis ejaculating on the genitals of a male infant.

In addition, on January 24, 2012, SA Tim Devine looked at one of the CDs seized.  The CD was titled "Big CD VI/ Pics."   CUBERO, in a post-Miranda statement on 01/19/12 (referenced below), stated the aforementioned CD-Rom contained child pornography.   The preliminary forensic examination revealed approximately two-hundred (200) files of suspected child pornography, including seventeen (17) movie files of suspected child pornography and the files described below:

- File titled **K@ty PTHC First-31.jpg** which contains an image file depicting a naked preteen female straddling a naked adult male. It appears the male has ejaculated on his leg.

- File titled **Naughty Little Pretty Girls preteen ptn pthc ptsc LSM0037.jpg** which contains an image file depicting a naked preteen female with her arms and legs tied to a bed.  Her legs are spread, her genitals are exposed, and she has a gag-ball strapped into her mouth.  The naked preteen female has writing on her stomach stating "Lick me please" with arrow pointing to her vagina.

- **Post-Miranda Confession by CUBERO**

CUBERO was arrested based on the images and videos found on the HP Laptop.   After his arrest, also on January 19, 2012, law enforcement interviewed CUBERO.   Prior to the interview, CUBERO was advised of Miranda rights, which he stated he understood.   He waived his Miranda rights both verbally and in writing.    CUBERO stated he has resided at the Residence for approximately four (4) years.  CUBERO stated he utilized the HP laptop computer and peer to peer software to download and view child pornography.  CUBERO stated he utilized the search term "PTHC" to search for files on the peer to peer network and knew the term "PTHC" is associated with child pornography.  CUBERO identified a CD-Rom seized from the Residence as containing files of child pornography.

Law enforcement seized a small amount of cocaine during the search of the Residence, and CUBERO admitted to having a "serious" cocaine addiction.  He told law enforcement that when he gets high on cocaine, he has trouble getting an erection.  To pleasure himself, he watches child pornography.  The defendant stated that he never had to the urge to commit a hands-on offense.

## PROCEDURAL BACKGROUND

On February 2, 2012, a federal grand jury sitting in the Southern District of Florida indicted the Defendant, Francisco CUBERO, on two counts of possession of child pornography (i.e., one for each media – the laptop computer and the CD) (Counts 2-3) and one count of distribution of child pornography (Count 1).  On March 13, 2012, a discovery conference was held in this case, whereby defense counsel previewed the child pornography files at issue here (along with other items found on the Defendant's computer).  Prior to the discovery conference, the undersigned AUSA informed defense counsel that, if the defendant wanted, a psychologist or other specialist could also be present to view the images and video files.  The psychologist did not attend the discovery conference.

After the discovery conference, the psychologist attempted to contact the case agent, Special Agent Timothy Devine (HSI), but to get his input regarding the images – not to view them.  The case agent informed her, and defense counsel, that the images speak for themselves.  Defense counsel was provided with a forensic report regarding the total images and video files found on CUBERO's computer and CD.

On May 10, 2012, the Defendant pled guilty to all of the charges in the Indictment.  There is no plea agreement in this case.  The Defendant signed a factual proffer (see D.E. 27).  The Defendant was psychologically evaluated by Dr. Amy C. Swam.  Dr. Swam did not review

the images or video files at issue in this case.  Nor did she or defense counsel request for her to

do so.  A hardcopy of Dr. Swam's report was received by the undersigned AUSA on July 18,

2012.  As explained above, the Defendant has filed objections to the PSI, as well as a sentencing

memorandum requesting a downward variance from the sentencing guideline range.

## ARGUMENTS

### I.   THE PSI PROPERLY CALCULATES THE SENTENCING GUIDELINE RANGE.

The Defendant argues that the PSI improperly calculated his sentencing guideline range

because (a) there was a two-level increase pursuant to Section 2G2.2(b)(3)(F) for distribution of

child pornography, which, according to the Defendant, should not apply because he did not

intend to disseminate child pornography and is also tantamount to double-counting, and (b) a

two-level decrease pursuant to Section 2G2.2(b)(1) should be applied because the Defendant did

not distribute child pornography.  The Defendant is incorrect.  For the reasons explained below,

the PSI has properly calculated the total offense level.

#### A.  The Defendant's Objection to the Two-Level Increase Pursuant to § 2G2.2(b)(3)(F).

First, CUBERO's challenge to the two-level distribution enhancement is factually and

legally unsupported.   The guideline for child pornography offenses calls for a two-level

sentencing enhancement if the defendant used a computer.  U.S.S.G. § 2G2.2(b)(6).  It also

provides for another two-level increase if the defendant distributed child pornography.  U.S.S.G.

§ 2G2.2(b)(3)(F). The application notes define "distribution" as:

> any act, including possession with intent to distribute, production,
> transmission, advertisement, and transportation, related to the
> transfer of material involving the sexual exploitation of a minor.
> Accordingly, distribution includes posting material involving the
> sexual exploitation of a minor on a website for public viewing but

does not include the mere solicitation of such material by a
defendant.

U.S.S.G. § 2G2.2, comment. (n.1).

The Eleventh Circuit has held that "[b]y doing nothing to protect the [downloaded child

pornography] images and allowing them to remain in a shared folder, [a defendant] distributed

the images within the meaning of Section 2G2.2(b)(3)(F)."  See United States v. Nelson, 442

Fed. Appx. at 498.  Conversely, Section 2G2.2(b)(1) provides for a two-level reduction if the

defendant only solicited, or sought to receive, child pornography.  See U.S.S.G. § 2G2.2(b)(1).

Here, the record shows that CUBERO admittedly used a file-sharing network to

download child pornography, stored his files in a shared folder on the network, and allowed

other users to access his files.  Additionally, there was no evidence on the record that CUBERO

was not aware of how the sharing program functioned or of the distribution that resulted from its

function.  Further, during his change of plea colloquy, and by and through his factual proffer,

CUBERO admitted to the distributing child pornography.  That is the heart of Count 1 of the

Indictment.

Moreover, the plain language of Section 2G2.2(b)(3)(F) and the commentary interpreting

it also support the distribution enhancement.  Specifically, the application notes show that

posting files on an internet site for public viewing warrants an enhancement, and information

from the officer's investigation suggested that CUBERO did that by loading, and using, various

peer-to-peer file-sharing networks.  Nelson, 442 Fed. Appx. at 498.  Moreover, while the

Eleventh Circuit has not interpreted, in a published opinion, the scope of Section 2G2.2(b)(3)(F)

as applied to a defendant who used a peer-to-peer file-sharing network, the Fourth and Seventh

Circuits have affirmed application of the two-level enhancement where the defendant used a

peer-to-peer file-sharing network to download child pornography.  See United States v. Layton,

564 F.3d 330, 335 (4th Cir. 2009) (holding that use of a peer-to-peer file-sharing program constitutes distribution for the purposes of U.S.S.G. § 2G2.2(b)(3)(F)); United States v. Carani, 492 F.3d 867, 875–76 (7th Cir. 2007) (affirming application of enhancement where defendant made child pornography files available through file-sharing program and knew other users were downloading the files); United States v. Shaffer, 472 F.3d 1219, 1223–24 (10th Cir. 2007) (holding that there was sufficient evidence of distribution pursuant to 18 U.S.C. § 2252A where the defendant freely allowed other users of a file-sharing network to access his files and "understood that file sharing was the very purpose" of the network).

The Eighth Circuit has held more expansively that because the purpose of a file-sharing program is distribution, "[a]bsent concrete evidence of ignorance—evidence that is needed because ignorance is entirely counterintuitive—a fact-finder may reasonably infer that the defendant knowingly employed a file sharing program for its intended purpose." United States v. Dodd, 598 F.3d 449, 452 (8th Cir.) (emphasis omitted), cert. denied, 130 S. Ct. 3533, (2010).

Similarly, the Defendant's double-counting argument is without merit. To be clear, the Eleventh Circuit has not addressed, in a published opinion, whether application of Section 2G2.2(b)(3)(F), together with the distribution charge, constitutes impermissible double counting. Nevertheless, guideline sections are presumed to apply cumulatively where, as here, there is no contrary direction found in the guidelines. Nelson, 442 Fed. Appx. at 499; see also United States v. Carter, 2008 WL 3929344, 292 Fed. Appx. 16 (11th Cir. Aug. 27, 2008). Moreover, other circuit courts have rejected other "double counting" challenges, particularly where, as here, multiple images or multiple computers are seized. See United States v. McNerney, 636 F.3d 772, 775, 780 (6th Cir. 2011) (double counting challenge to consideration of multiple, but identical, images rejected); United States v. Tenuto, 593 F.3d 695, 697 (7th Cir.), cert. denied,

130 S. Ct. 3427 (2010) (concluding that lower court did not rely on conduct that was necessary to satisfy an element of the defendant's conviction for transporting child pornography, and use the same conduct to enhance the defendant's guideline range for distribution).  As such, applying the two-level increase pursuant to Section 2G2.2(b)(3)(F) is not tantamount to double-counting.

### B. The Defendant's Request for a Two-Level Decrease Pursuant to § 2G2.2(b)(1).

The Defendant has requested a two-level decrease pursuant to Section 2G2.2(b)(1).  That guideline states: "If (A) subsection (a)(2) applies; (B) the defendant's conduct was limited to the receipt or solicitation of material involving the sexual exploitation of a minor; and (C) the defendant did not intend to traffic in, or distribute, such material, decrease by 2 levels."  For the reasons explained above, the Defendant did engage in distribution of child pornography.  Therefore, he should not receive a two-level decrease pursuant to Section 2G2.2(b)(1).

## II.   IMPOSING A SENTENCE WITHIN THE ADVISORY GUIDELINE RANGE IS APPROPRIATE UNDER 18 U.S.C. § 3553(a).

It is well-settled that a district court must still consult the Sentencing Guidelines Manual and consider the advisory sentencing guidelines range for an instant offense prior to rendering a sentence.  United States v. Crawford, 407 F.3d 1174, 1178-79 (11th Cir. 2005).  To properly calculate the sentencing guidelines range, the court must also consider departures – upwards or downwards – that may be warranted.  United States v. Jordi, 418 F.3d 1212, 1215 (11th Cir. 2005) ("the application of the guidelines is not complete until the departures, if any, that are warranted are appropriately considered."); U.S.S.G. § 1B1.1(b).

After properly calculating the sentencing guidelines range, a district court must next consider and balance the sentencing factors in 18 U.S.C. § 3553(a) to determine a "reasonable" sentence, which may be more or less severe than that provided for by the guidelines range.

United States v. Talley, 431 F.3d 784, 786 (11th Cir. 2005).  The court need not discuss each of the 3553(a) factors in rendering a sentence, United States v. Scott, 426 F.3d 1324, 1329 (11th Cir. 2005), so long as the record reflects consideration of the factors in general, Nelson v. United States, 555 U.S. 350 (2009).[1]

Finally, in rendering a sentence, a district court must adequately explain the chosen sentence, including any deviation from the advisory sentencing guidelines range.  See, e.g., Rita v. United States, 551 U.S. 338, 356-57 (2007); United States v. Pugh, 515 F.3d 1179, 1191 n.8 (11th Cir. 2008); see also Irizarry v. United States, 553 U.S. 708, 714 (2008) (discussing the difference between a departure and a variance).

Here, the advisory sentencing guideline range, as calculated in the PSI, per Section 2G2.2 of the Sentencing Guidelines, is 151 to 188 months of imprisonment.  Imposing a sentence within the advisory sentencing guideline range is appropriate under 18 U.S.C. § 3553(a).

### A.  The Offense Conduct Warrants a Sentence Within The Guideline Range

First, as part of the factors laid out in Section 3553(a), the Court is required to consider the nature and circumstances of the offense conduct – here, possession of child pornography, in violation of Title 18, United States Code, Section 2252(a)(4)(B).  At the heart of this crime, and an important factor for sentencing purposes, is the type of child pornography that a defendant is looking at – i.e., the age of the children involved, the sexual acts depicted in the videos and images, the length of the videos, and so forth – not just the number of files a defendant has

---

[1]       The following are the factors outlined in Section 3553(a): (i) The nature and circumstances of the offense and the history and characteristics of the defendant; (ii) The need for the sentence imposed – (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) The kinds of sentences available; (iv) The kinds of sentence and the sentencing range established for the instant offense by the Guidelines; and (v) Any pertinent policy statements issues by the United States Sentencing Commission.  See 18 U.S.C. § 3553(a).

downloaded from the Internet.   Indeed, while the material involved in all cases of child pornography is disturbing, there are images and videos that are particularly graphic, heinous, and explicit.

The Defendant downloaded, possessed, and distributed files that fall into such category. For example, one of the images that the Defendant downloaded and viewed depicted nude children under the age of twelve exposing their buttocks and lying in a pile of dirt and muck. Another depicts a naked female child under the age of twelve putting her mouth on the exposed breast of an adult female, who is holding a toddler child (i.e., under five years old) in her lap.  As well, also downloaded and viewed was an image of a naked adult male sitting with a naked toddler child.  The toddler child is touching the naked adult male's erect penis while the adult male is touching/covering the toddler's genitals with his hands.  There were also images of infants (i.e., children under two years old) on the Defendant's computer.  One image is of an infant holding an adult male's erect penis.  Another depicted an adult male's erect penis touching the anus of a naked male infant.

In addition to the still images that the Defendant downloaded and viewed, there were numerous video files on his computer.  Similar to the images, some of the video files are extremely disturbing.  For example, there are several video files from the "Vicky" series.  One depicts "Vicky" (then, eight years old), dressed up as a stripper and dancing provocatively as an adult male instructs her to strip naked.  After she strips naked, the clip shows the adult male engaged in anal and vaginal sex with "Vicky" and ejaculating into her mouth.  Another video shows "Vicky" engaged in oral sex with a dog at the instruction of the same adult male.

Even in the world of child pornography, the child pornography files that the Defendant possessed are considered extreme in nature.  One of the reasons for that is the deep impact that

sexual abuse has on such young children – that is, prepubescent children.  Indeed, among other harms, infants and toddlers are at an increased risk for genital injury and harm to reproductive organs both from direct trauma, and remote infections to which they have minimal immunity. (See Affidavit of Sharon W. Cooper, Developmental and Forensic Pediatrics, P.A., attached as Attachment A.)  Moreover, preschool and elementary school aged victims have an increased risk for sexualized behaviors, dissolution of appropriate boundaries, and re-victimization.  (Id.)

In addition, the manner in which the Defendant saved and stored some of the child pornography files he downloaded is of concern.  The Defendant did not simply download the files and keep them on his computer to peruse at leisure.  Rather, he took an extra step to retain some files he downloaded and viewed by burning those files onto a CD.  He kept these files as part of his personal collection, and knew precisely what type of material he was retaining.  In fact, CUBERO identified the CD containing child pornography to law enforcement officers as they conducted a search of his Residence for all media containing child pornography.

### B.  The Need for a Sentence Within the Guideline Range

In determining a sentence, the Court is also required to consider the need for the sentence imposed, including the seriousness of the offense, the need for specific and general deterrence, the impact of the sentence on the defendant, and the impact of the sentence on the victims.  Due to the graphic and extreme nature of the child pornography that the Defendant possessed, there is a grave need for the Court to impose a sentence within the advisory sentencing guideline range. Undoubtedly, the offense conduct is serious – and should be treated that way.

With respect to general deterrence, a primary purpose of child pornography legislation is to combat the consumption of, as well as the market for, child pornography.  By imposing severe penalties on the individuals whose prurient demands fuel the market for violent and egregious

child pornography, the courts can begin to reduce the market for child pornography, and, as a result, reduce the number of children who are victimized by the production of child pornography. This is particularly true in cases where the victims are infants and toddler children.

Moreover, though there is no evidence that the Defendant ever engaged in sexual contact with a minor, the Defendant unquestionably spent many hours seeking out and viewing videos that portrayed children engaging in sexual acts with adults and other children. There is a need for specific deterrence in this case, where the Defendant clearly spent time fantasizing about binding and raping <u>very</u> <u>young</u> children – and went so far as to burn some of the videos he downloaded onto a CD for long-term retention. The Defendant also admitted to viewing child pornography while "high" on cocaine, partly because it provided him with the additional stimulus to get aroused. CUBERO even admitted that he finds 13 to 17 year old girls to be the most sexually arousing. The Defendant's conduct and fascination with child pornography – and, particularly, young children, bondage, and bestiality – is indicative of the powerful urges he feels, and raises serious concerns about the need to incapacitate him before he acts out his fantasies.

Also, of importance, on CUBERO's computer, law enforcement found several personal photographs taken by the Defendant that were alarming. These images were shown to defense counsel, Manuel Gonzalez, at the discovery conference in the presence of the forensic examiners and the undersigned AUSA. First, several images depicted CUBERO using a firearm to point at various women while he engaged in sexual intercourse with them. Although none of the women appeared to be sedated or forced into the sexual acts, the photographs were graphic and disturbing in nature. Additionally, a couple of photographs depicted an adult male, later identified as a relative of CUBERO, jesting at a young woman, who lay naked on the floor of a

bathroom shower.  In the photograph, the woman did not appear to be conscious and looked younger than eighteen years old.  For these reasons, law enforcement took steps to identify the woman, a high school senior, and contact her.  She was interviewed.  She stated that she did not recall any such photograph being taken of her.  However, she also stated that, based on the date that the photograph was taken, she had turned eighteen years old one month prior.

Finally, the public and the victims of child pornography have a strong interest in punishing the Defendant for this serious crime – a crime that causes actual injury to the innocent and young victims whose most traumatic moments the Defendant and others like him transform into objects of pleasure and fantasy.

Over two decades ago, the Supreme Court, in <u>New York v. Ferber</u>, 458 U.S. 747 (1982), discussed the very real harm that the distribution of child pornography causes its victims:

> The distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children . . . . .[T]he materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation . . . .[P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography.

<u>Id.</u> at 759-60 and n.10 (internal citations omitted).

<u>Ferber</u> was decided before the advent of digital cameras, long before gigabytes of information could be stored on a hard drive or a thumb drive, and before every household in America had a computer connected to the Internet.  When <u>Ferber</u> was decided, a producer of child pornography needed photographic equipment, access to a darkroom, and/or video equipment to ply his trade.  Against this backdrop, the Supreme Court's observations regarding the harm caused by the distribution of child pornography ring even more true today, when the

images of innocent victims are easily and instantaneously transferred from one living room to another at the click of a button. The interest of the victims, infant and toddler children, in a sentence that reflects the seriousness of child pornography offenses cannot be overstated.  (See Attachment B: Redacted Victim Impact Statement from "Vicky".)  These interests are not served by a downward variance to the advisory sentencing guideline range in this case.

### III.     A DOWNWARD VARIANCE IS NOT WARRANTED IN THIS CASE.

As this Court is aware, with the advent of the sentencing guidelines being presumptively reasonable, but not mandatory, there are child pornography cases where the United States has either agreed to a downward variance or has not appealed an adverse sentence.  While there are likely several cases that fall into these categories, particularly the latter, in the Southern District of Florida, the undersigned Assistant United States Attorney personally knows of only one child pornography case where the United States has ***agreed*** to a downward variance – United States v. Carlo DeMarco (10-20261-CR-MOORE) – and of only two child pornography cases where the United States has ***not appealed*** a downward variance imposed – United States v. Christopher Riley, 655 F.Supp.2d 1298 (S.D. Fl. 2009), and United States v. Carlos Ramirez (11-20551-CR-SEITZ).  Those cases can easily be distinguished from the facts here.

First, to be clear, the United States ***does not*** routinely agree to variances in child pornography cases.   In fact, the opposite is true.   Indeed, only in cases of extenuating circumstances will a downward variance even be requested or agreed to by the United States Attorney's Office.  The DeMarco case was one of such circumstances and an outlier in many respects.

By way of background, Carlos DeMarco was charged with two counts of possession of child pornography and two counts of distribution of child pornography.  He pled guilty to one

count of distribution of child pornography, which carries a mandatory minimum sentence of five (5) years imprisonment.   Due to the content and quantity of child pornography files that DeMarco possessed and distributed, he faced a sentencing guideline range of 151-188 months imprisonment (after acceptance and with a criminal history category I).   He argued for a downward variance to the mandatory minimum sentence based upon his age, lack of a prior criminal record, susceptibility to abuse in prison, mental capacity, and history of childhood sexual and physical abuse.

On September 27, 2011, this Court held a sentencing hearing in the <u>DeMarco</u> case.   The prosecutor requested a continuance of the sentencing hearing in light of the evidence presented by DeMarco.   Notably, a review of the transcript suggests that, at that hearing, DeMarco's biological mother, Elsy Turriago, testified that she physically, verbally, and emotionally abused DeMarco throughout his childhood.   In addition, she testified that DeMarco's stepfather sexually abused him from the age of seven to nine and that, due to financial and emotional weakness on her part, she did nothing to stop the abuse.   Although DeMarco begged for her help, she testified that she allowed the abuse of him to continue.

Moreover, a psychological evaluation stated that DeMarco, who was already an introvert, became a loner and socially awkward due to the various childhood abuses suffered.   He also struggled with Asperger's disorder, which was never addressed or treated by his family. DeMarco, thirty-five years old at the time of sentencing, had no prior criminal history and, despite his childhood, had managed to obtain three Associate of Science degrees, and gain full-time employment.

On October 6, 2011, the Court revisited sentencing for DeMarco.   The United States agreed to the defense's request for a downward variance – from 151 months (the low-end of the

advisory sentencing guideline range) to sixty (60) months (the mandatory minimum sentence). The United States's decision to agree to a downward variance was made after a careful review and confirmation of the facts regarding DeMarco.   As counsel for DeMarco stated in a Sentencing Memorandum, "a great number of defendants … have some species of psychological disorder … Carlo DeMarco's history and characteristics however are **unique**."  (D.E. 76, pp. 5-6) (emphasis added).

Indeed, the unique factual history and characteristics present in the <u>DeMarco</u> case are distinguishable from other child pornography cases, including the one before the Court.  Here, while the Defendant is relatively young, that is, thirty (30) years old, he is the product of a supportive and loving family and tremendous life opportunities.  Though he does not personally know his biological father, and suffered trauma from his grandmother's death, the record suggests that his mother, stepfather, and siblings have loved – and continue to love – CUBERO unconditionally.   Further, CUBERO has had normal social and romantic relationships with women, as attested to by the letter filed by Grace Moller (his former girlfriend), and the many photographs found on his computer of him with friends.  As well, the Defendant reported no history of any social interaction or relationship issues.

Furthermore, although DeMarco had over 600 images of child pornography in his possession, <u>none</u> of those images depicted infants or toddler children – or torture and bestiality for that matter.  The very nature of the material involved in this case is vastly different from that which DeMarco possessed and distributed.  To analogize the two cases simply because they involve child pornography would be to diminish the harm and pain caused to the infants and toddler children abused in the videos that the Defendant concedes to have saved and viewed.

With respect to child pornography cases where the United States did not appeal the imposition of a downward variance, it is important to first note that the decision to appeal an adverse sentence ultimately rests with the Solicitor General, not the prosecutor on the case.  As the Supreme Court stated in United States v. Mendoza, 464 U.S. 154 (1984), unlike a "private litigant who generally does not forego an appeal if he believes that he can prevail, the Solicitor General considers a variety of factors, such as limited resources of the government and the crowded dockets of the courts, before authorizing an appeal … The application of nonmutual estoppel against the government would force the Solicitor General to abandon those prudential concerns and to appeal every adverse decision in order to avoid foreclosing further review." Id. at 161 (internal citation omitted).

Further, the lack of an appeal to an adverse sentence is *not* synonymous with the United States agreeing to that sentence.   Rather, the United States recognizes that, post-Booker, district court judges are granted broad discretion in imposing sentences – including the discretion to impose sentences based on a policy disagreement with the sentencing guidelines (see Vasquez v. United States of America, Brief for the United States of America, No. 09-5370, 2009 WL 5423020, at *14-15 (Nov. 16, 2009)).  Indeed, since the Supreme Court's Booker decision, it has been "pellucidly clear that the familiar abuse-of-discretion standard of review now applies to appellate review of sentencing decisions."  Gall v. United States, 552 U.S. 38, 46 (2007); see also Pugh, 515 F.3d at 1191 (explaining that the Supreme Court's teachings "leave no doubt that an appellate court may still overturn a substantively unreasonable sentence, albeit only after examining it through the prism of abuse of discretion, and that appellate review has not been extinguished").  That familiar standard "allows a range of choice for the district court, so long as

that choice does not constitute a clear error of judgment."  United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc) (internal citation omitted).

As the Eleventh Circuit has explained, "under the abuse of discretion standard of review there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call. That is how an abuse of discretion standard differs from a *de novo* standard of review."  Id. (quoting Rasbury, 24 F.3d at 168); see also, e.g., Ledford v. Peeples, 605 F.3d 871, 922 (11th Cir. 2010) ("[T]he relevant question [when reviewing for abuse of discretion] is not whether we would have come to the same decision if deciding the issue in the first instance. The relevant inquiry, rather, is whether the district court's decision was tenable, or, we might say, 'in the ballpark' of permissible outcomes.").  Therefore, the United States must show that a federal sentence is unreasonable in light of both record and statutory factors in order to prevail on appeal.  See, e.g., United States v. Irey, 612 F.3d 1160 (11th Cir. 2010); United States v. McBride, 511 F.3d 1293 (11th Cir. 2007).

Moreover, it is important to note that in cases where an adverse sentence has been imposed, at the time of sentencing, the United States opposed the defendant's request for a downward variance.  For example, in Riley and Ramirez, the prosecutors' position was very clearly stated that their recommendation was a sentence within the advisory sentencing guideline range.  Given the specific facts of each case, however, the courts chose to vary downward. Notably, as discussed below, the facts of those cases are not analogous here and, they should have no bearing on the sentence imposed by this Court.

In Riley, the defendant, a twenty-four (24) year old male with a high school education, entered an online chat room and initiated an instant message with a person he believed to be the mother of a ten year old girl.  The person was actually an undercover FBI agent.  During

conversation, the defendant expressed interest in engaging in sexual activity with the agent and young girl, and requested pictures of the daughter as part of a trade. The agent sent the defendant four images of child pornography, two of which depicted children under five (5) years of age. After making contact with the defendant, law enforcement discovered 900 images and ten (10) videos of child pornography on the defendant's computer. The defendant was married at the time of his arrest and came from a loving and supportive home. He had a stable job as an inventory manager at Wal-Mart until his arrest in that case. A psychological evaluation done of the defendant indicated that he had childhood traumas, but posed little threat of reoffending.

Christopher Riley ultimately pled guilty to one count of transportation of child pornography, and the advisory sentencing guideline range was 210-260 months. The statutory maximum was 240 months. The district court varied downward to 60 months, the mandatory minimum.

Though the facts involved in the Riley case are egregious, and the United States's recommendation for a sentence at the high-end of the sentencing guideline range was overruled, it is important to note that there, the Honorable Judge King relied upon a paper published by Assistant Federal Public Defender Troy Stabenow, entitled "Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines" (hereinafter, the "Stabenow Report"), in rendering his decision. The Stabenow Report analogized the crack cocaine sentencing guidelines, criticized by the Supreme Court in Kimbrough v. United States, 128 S. Ct. 558 (2007), to the child pornography sentencing guidelines. The Stabenow Report is inaccurate, however, and its conclusions are not supported by Eleventh Circuit law, or other district courts in the Southern District of Florida. To the extent that the Court wants to rely on the rationale in the Stabenow Report, the United States believes that it is inappropriate.

To be clear, in <u>Kimbrough</u>, the Supreme Court ruled that district courts could reject the crack cocaine guidelines because of the combination of (1) Congress' silence with regard to the crack/powder disparity, <u>see</u> <u>Kimbrough</u>, 128 S.Ct. at 571, and (2) the United States Sentencing Commission's failure to fulfill its characteristic institutional role, <u>see</u> <u>id.</u> at 574-75.   But <u>Kimbrough</u> does not stand for the proposition that Congress should have no role in shaping sentencing policy.  To the contrary, noting that "Congress has shown that it knows how to direct sentencing practices in express terms," <u>id.</u>, the Court was persuaded by Congress' failure to weigh in on the crack/cocaine controversy.

In contrast to the crack guideline at issue in <u>Kimbrough</u>, the child pornography guideline at issue here is the product of both the Commission's empirical analysis and congressional directives.  Thus, the salient features of <u>Kimbrough</u> are not present here, and there is no justification for a wholesale rejection of Section 2G2.2.  Indeed, in <u>United States v. Pugh</u>, <u>supra</u>, the Eleventh Circuit considered <u>Kimbrough</u>'s directives in the context of Section 2G2.2 and flatly rejected the notion that courts could simply disregard that section:

> The Supreme Court has recently held that a district judge has the authority to deviate from the Guidelines in a particular crack cocaine case because the Guidelines range for these offenses was based on "the mandatory minimum sentences set in the 1986 Act, and did not take account of 'empirical data and national experience.'" *Kimbrough*, 128 S.Ct. at 575 (citation omitted).   The Guidelines involved in Pugh's case, however, do not exhibit the deficiencies the Supreme Court identified in *Kimbrough*.  First, the Guidelines range is derived at least in part from the early Parole Guidelines, rather than directly derived from Congressional mandate. *See, e.g.,* Revised Draft Sentencing Guidelines 72 (Jan.1987) ("The serious nature of th[e] offense [of transporting, receiving, or trafficking in material involving the sexual exploitation of a minor] is reflected in the enhancement for the distribution of material depicting minors under age twelve. The amount of enhancement reflects the time specified by the parole guidelines.").  Second, there is no indication that either the Guidelines range or the policy statement involved in Pugh's sentence suffers from any criticisms like those Kimbrough identified for the crack cocaine Guidelines. There, the Supreme Court found that the Sentencing Commission itself had "reported that the crack/powder disparity produces disproportionately harsh sanctions." *Kimbroug*h,

128 S.Ct. at 575.  Here, the Sentencing Commission has not made any similar statements; rather, the Guidelines and policy statement are based in part upon Congress's longstanding concern for recidivism in such cases[.]

Id. at 1201 n.15.

Furthermore, several district court judges in the Southern District of Florida have concluded that the Stabenow Report is inaccurate, faulty, and unreliable.   For example, in United States v. Ricardo Maciel (10-20686-CR-JORDAN), and United States v. Jonathan Quintana (10-20696-CR-GOLD), the courts disagreed with defense counsels' arguments the Stabenow Report supported a downward variance and, instead, flatly dismissed its accuracy. Instead, the Honorable Judge Jordan imposed a 144-month sentence upon Maciel and the Honorable Judge Gold imposed an 84-month sentence upon Quintana.   Both Maciel and Quintana were first-time offenders who pled guilty to distributing and possessing child pornography.  Essentially, cases those were factually similar to that at hand.  See also United States v. Guillermo D. Martinez, 11-20718-CR-MOORE (on March 15, 2012, the defendant, a first-time offender who pled guilty to possession of child pornography, was sentenced to serve a term of imprisonment of 78 months).

For these reasons, the Riley case is not analogous to the situation here and should not be considered by the Court in imposing sentence upon the Defendant.  Similarly, the Ramirez case is not analogous.   In that case, the undersigned Assistant United States Attorney was the prosecutor.  There, the defendant, who pled guilty to transportation of child pornography, faced a sentencing guideline range of 121-151 months of imprisonment.  The United States argued for a sentence at the low-end of that range.  The defendant requested a downward variance, citing to Riley.  This Court imposed a sixty (60) month sentence, the mandatory minimum, explaining that the defendant had only been charged with transportation because, during his move from

North Carolina to Miami to seek employment and be with family, he had, among his personal belongings, two (2) CDs and a thumb drive that contained images of child pornography.  The court noted that, had the defendant been charged with possession of child pornography, the advisory sentencing guideline range would have been much lower.

In addition, the defendant, Carlos Ramirez, thirty-two (32) years old, had been psychologically evaluated and, though the report was not finalized, the evaluation indicated that the defendant struggled with his sexual identity, was a loner, socially inept, had a low comprehension level, and had no indicators that he was likely to hands-on offend.  Notably, the psychologist who did the evaluation attended the discovery conference and viewed all of the images and video files found on the defendant's computer, thumb drives, and CDs.  The images and video files that the defendant had in his possession were mostly of ten to sixteen year old boys, posing naked and engaged in sexual conduct with other young boys.  The defendant stated that he viewed the child pornography files out of "curiosity" and because he struggled with his own sexual identity.   The type of images that the defendant was charged with possessing supported that assertion.

Clearly, the facts of the Ramirez case differ from the Defendant's.  The Defendant is not a young man struggling with his sexual identity, nor is he viewing sexual images of others that are even arguably in his peer group.  Rather, the Defendant is a thirty (30) year old male who was viewing, and saving, videos of infants and toddler children being tortured and pained by adults.  The downward variance in the Ramirez case should have no bearing on this Court's consideration in imposing sentencing on the Defendant.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court sentence the Defendant to a term of imprisonment of 151 months followed by a life-time term of supervised release.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By:     *s/ Vanessa S. Johannes*
Vanessa Singh Johannes
Assistant United States Attorney
Court Identification No.:  A5501644
99 Northeast 4th Street
Suite 616
Miami, Florida 33132-2111
Tel: (305) 961-9023
Fax: (305) 530-4676

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on July 31, 2012, I filed the foregoing with the Clerk of the Court using CM/ECF.  A copy of the foregoing was delivered to counsel for the defendant, Manuel Gonzalez, via email.

*s/ Vanessa S. Johannes*
Vanessa Singh Johannes
Assistant United States Attorney